UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 APR 23   AM 10: 00

CLERK

BY_____
DEPUTY CLERK

JASON F.,                                    )
                                             )
              Plaintiff,                     )
                                             )
       v.                                    )    Case No. 2:23-cv-00025
                                             )
MARTIN J. O'MALLEY, Acting                   )
Commissioner of Social Security,             )
                                             )
              Defendant.                     )

**OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR AN ORDER
REVERSING THE DECISION OF THE COMMISSIONER, AND GRANTING
THE COMMISSIONER'S MOTION TO AFFIRM**
(Docs. 8 & 12)

Plaintiff Jason Fleming is a claimant for Disability Insurance Benefits ("DIB") and

Supplemental Security Income ("SSI") payments under the Social Security Act ("SSA")

and brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social

Security Commissioner (the "Commissioner") that he is not disabled.[1] (Doc. 8.) The

Commissioner moves to affirm. (Doc. 12.) The court took the pending motions under

advisement on July 20, 2023.

After his applications for DIB and SSI were denied initially and on reconsideration

by the Social Security Administration, Administrative Law Judge ("ALJ") Dory Sutker

found Plaintiff ineligible for benefits because Plaintiff had not been under a disability

within the meaning of the SSA from March 14, 2020 through the date of ALJ Sutker's

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of
any medically determinable physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a continuous period of not less than
[twelve] months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or
mental impairment or impairments" must be "of such severity" that the claimant is not only
unable to do any previous work but cannot, considering the claimant's age, education, and work
experience, engage in any other kind of substantial gainful work which exists in the national
economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

decision. On appeal, Plaintiff argues that ALJ Sutker's findings with respect to the weight given to the opinions of Robert DuWors, PhD, and Plaintiff's credibility are not supported by substantial evidence, because: the ALJ (1) erroneously concluded Plaintiff could engage in independent activities; (2) incorrectly found internal inconsistencies in Dr. DuWors's neuropsychological examination, opinions, and treatment notes; and (3) relied on factors that do not detract from the supportability and consistency of Dr. DuWors's opinions. He requests the court remand this case for additional consideration of Dr. DuWors's opinions.

Plaintiff is represented by Craig A. Jarvis, Esq. Special Assistant United States Attorney Andreea L. Lechleitner represents the Commissioner.

**I.     Procedural History.**

Plaintiff filed his application for DIB on December 18, 2019 and for SSI on June 9, 2020, alleging disability beginning on December 18, 2019 based on depression, high blood pressure, psoriasis, diabetes, and hearing loss. On June 23, 2020, Plaintiff refiled his application for DIB and SSI and amended his alleged onset date to March 14, 2020. After his claim and request for reconsideration was denied, Plaintiff timely filed a request for a hearing, which was held by video before ALJ Sutker on November 23, 2021. Plaintiff appeared and was represented by counsel. Both Plaintiff and Vocational Expert ("VE") Harris Rowzie testified.

On January 13, 2022, ALJ Sutker issued an unfavorable decision which Plaintiff administratively appealed. The Appeals Council denied review on December 9, 2022. As a result, the ALJ's disability determination stands as the Commissioner's final decision.

**II.     ALJ Sutker's January 13, 2022 Decision.**

Plaintiff was forty-one years old at the onset date of his alleged disability. The ALJ found that Plaintiff has a limited education and has not engaged in substantial gainful activity since March 14, 2020. His past employment includes work as a housekeeping cleaner, a warehouse worker, and a van driver helper.

In order to receive DIB or SSI under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation framework

2

determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant can
> perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy
> that the claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.

§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability

within the meaning of the Act, and bears the burden of proving his or her case at steps

one through four of the sequential five-step framework established in the SSA

regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation

marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to

show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150

(alterations in original) (internal quotation marks omitted).

At Step One, ALJ Sutker found Plaintiff met the SSA's insured status

requirements through December 31, 2025, and that he had not engaged in substantial

gainful activity since March 14, 2020, the alleged onset date. At Step Two, she concluded

that Plaintiff had the following severe impairments: diabetes mellitus, obesity, hearing

loss, "intention tremors," (AR 17), post-traumatic stress disorder ("PTSD"), major

depressive disorder, and borderline intellectual functioning. In addition to these severe

impairments, ALJ Sutker found Plaintiff had a history of hypertension and psoriasis but

concluded that these conditions were managed medically and did "not impose more than

a minimal limitation to work related activities." *Id.*

At Step Three, ALJ Sutker determined that Plaintiff did not have an impairment or

combination of impairments that met or medically equaled the severity of one of the

Listings. In doing so, the ALJ analyzed Plaintiff's hearing loss under Listing 2.11 and

3

found that Plaintiff's speech reception threshold was at 45 dbHL in the left ear and 55 dbHL in the right ear with a word recognition score of 72% at 85 dbHL in the left ear. ALJ Sutker noted there was no evidence of a word recognition score of 60% or less using the Hearing Noise Test. She concluded that Plaintiff's impairments did not meet or medically equal the criteria of Listing 11.14, Peripheral Neuropathy, because the objective medical evidence did not establish:

> (A) disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities or (B) marked limitation in physical functioning, and in one of the following: (1) understanding, remembering, or applying information, (2) interacting with others, (3) concentrating, persisting, or maintaining pace, or (4) adapting or managing oneself.

*Id.* at 18.

Acknowledging that diabetes mellitus and obesity are no longer listed impairments, ALJ Sutker nonetheless found these conditions did not cause Listing-level impairments.

Regarding Plaintiff's mental impairments, ALJ Sutker found that Plaintiff had moderate limitations in four areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing himself. The ALJ concluded that the "paragraph B" criteria were not satisfied because Plaintiff's mental impairments did not cause at least two "marked" or one "extreme" limitation. *Id.* at 19. Because the "paragraph C" criteria were also not present, *id.*, ALJ Sutker concluded Plaintiff's mental impairments did not meet or medically equal Listings 12.04, 12.11, or 12.15.

At Step Four, ALJ Sutker determined Plaintiff had the residual functional capacity ("RFC") to:

> perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant needs an environment with no more than moderate noise level. The claimant cannot climb ladders, ropes or scaffolds. He cannot crawl. He can frequently handle and/or finger. He can

4

perform uncomplicated tasks (defined as straightforward tasks such as those typically learned in less than 30 days); instructions must be delivered orally and/or by demonstration. He can maintain concentration, persistence, and pace for two-hour blocks of time throughout the workday consistent with regularly scheduled breaks and lunch. The claimant would be limited to incidental contact with the general public, meaning dealing with the public cannot be part of the job duties but the claimant can tolerate brief encounters such as passing someone in a hallway. He can adapt to occasional routine changes.

*Id.* at 20-21.

The ALJ asked the VE hypothetical questions which included limitations to uncomplicated tasks and occasional brief and superficial interaction with the general public and routine interaction with coworkers and supervisors; a requirement for oral or demonstrative instructions; maintaining concentration, persistence, and pace for two-hour periods over the course of a normal workday and workweek; and permitting only occasional routine changes for a forty-three-year-old person. The VE opined that Plaintiff would be able to return to his previous work as a housekeeper with those limitations. The ALJ then asked the VE:

> Q With this modification. I want you to assume that the individual would be limited to incidental contact with the general public meaning dealing with the public could not be part of job duties, but the individual could tolerate brief encounters. Would that change your response?

> A Well, as described in the testimony it would not. As generally performed or as performed by the DOT, it would because of the fact that there would be some interaction with the public.

(AR 67.) When asked if other jobs would fit within this hypothetical, the VE testified Plaintiff could work as a silver wrapper, copy machine operator, or hand packager.

By limiting handing or fingering to frequent, rather than constant, and social interaction with the public to brief or occasional, rather than incidental, Plaintiff could work as a housekeeper, copy machine operator, or hand packager. Plaintiff asserts the VE's answers indicate Plaintiff could not return to his work as a housekeeper with a limitation of only incidental contact with the general public.

5

The VE further testified that the maximum tolerance for off-task behavior would be 10% of the time and for absences would be two unscheduled days per month. If a person was off task for at least 20% of the day or was absent four or more days per month, it would preclude substantial gainful activity.

Considering Plaintiff's age, education, work experience, and RFC, ALJ Sutker determined at Step Five that Plaintiff was able to return to past work as a housekeeper. She also found that other jobs exist in significant numbers in the national economy which Plaintiff could perform, including copy machine operator (approximately 13,637 jobs nationally) and hand packager (approximately 107,785 jobs nationally). As a result, ALJ Sutker concluded Plaintiff was not disabled.

## III.   Conclusions of Law and Analysis.

### A.   Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v. Sec'y, Dep't of Health & Hum. Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is

susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

The court does not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case[.]" *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted) (first alteration in original). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## B.  Whether the ALJ Erred in Evaluating Plaintiff's Ability to Function Independently.

Challenging ALJ Sutker's finding that he was able to engage in a wide range of daily activities, Plaintiff contends substantial evidence does not support that conclusion and argues the ALJ erred in assessing his credibility and the persuasiveness of Dr. DuWors's opinions. He asserts ALJ Sutker ignored his reliance on his girlfriend to assist in his daily activities and Dr. DuWors's opinion that Plaintiff's girlfriend "is essentially his caretaker[.]" (AR 491.)

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of . . . limitations into account, but is not required to accept the claimant's subjective complaints without question[.]" *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal citations omitted).

> First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce his [or her] symptoms. Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's subjective contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry.

*James D. v. Comm'r of Soc. Sec.*, 547 F. Supp. 3d 279, 289 (W.D.N.Y. 2021) (alterations adopted) (internal quotation marks and citations omitted). Although "the capability to perform activities of daily living is not inherently inconsistent with a finding of

7

disability, . . . the Commissioner's regulations expressly identify 'daily activities' as a factor the ALJ should consider in evaluating the intensity and persistence of a claimant's symptoms." *Coger v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 427, 436 (W.D.N.Y. 2018) (quoting 20 C.F.R. § 416.929(c)(3)(i)).

As the Second Circuit explained, a plaintiff's "ability to engage in certain activities of daily living[,]" including childcare, preparing meals, washing dishes, and driving to appointments, does not "foreclose [the plaintiff's] entitlement to disability benefits." *Colgan v. Kijakazi*, 22 F.4th 353, 363 (2d Cir. 2022). A plaintiff "need not be an invalid to be found disabled under the Social Security Act." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks omitted).

Plaintiff's reason for leaving his employment as a housekeeper was tremors in his hands. (AR 412, 513.) He does not contend his cognitive functioning prevented him from working, nor does he contend his cognitive functioning has changed. On July 20, 2020, he filled out a questionnaire regarding his ability to function. He reported that he lived with his girlfriend, child, and two stepchildren. He stated his depression makes it hard to concentrate. He described his day as follows: "wake up, get dressed, eat, rest most of the day other than if [he] has appointments, shower, take med[ication]s, go to bed." *Id.* at 258. On March 10, 2021, Plaintiff submitted an updated questionnaire, in which he reported walking his daughter to and from school, caring for his own personal grooming, preparing simple meals, performing light cleaning, and doing laundry. He goes fishing weekly, watches movies, and plays games on his cellphone. He testified that he could wash dishes for approximately ten minutes before needing to take a break for three to four minutes. He indicated that he does not take care of other people or animals and has no problems with his personal care. He drives "and can get around" but not often. *Id.* at 420. He can count change and handle a savings account but needs assistance paying bills and writing checks.

According to the questionnaire, Plaintiff does not engage in household shopping independently but occasionally shops with his girlfriend, who also assists him with household chores. He testified his girlfriend set up the video call for the hearing because

he is not "the greatest with electronics[,]" *id.* at 61, and that she helps him with "a lot[,]" *id.* at 62, including accompanying him to doctor's appointments to help him understand what the doctors are saying and by reading his paperwork to him and copying his answers.

Plaintiff contends that sometimes his hands shake and he drops his cellphone. His social interactions are limited to his girlfriend, children, stepchildren, and girlfriend's family, and he acknowledges he has issues with anger towards others. Due to his anxiety and PTSD, he has difficulties interacting with others, especially strangers.

Plaintiff testified he takes medications for his various conditions but they make him drowsy and he needs reminders to attend appointments and to refill and take his medications. He claimed he was unable to work due to tremors in his hands and his depression and asserts he left his previous job delivering appliances[2] due to these conditions. His depression got progressively worse in his last two years of working, and, when he stopped working, his depression became slightly better. He does not have difficulty completing tasks.

Plaintiff took special education classes in school and struggled academically, particularly with reading, however, he can "read a little." (AR 48.) He left high school in the tenth grade and did not obtain a high school diploma or Generalized Equivalency Diploma.

ALJ Sutker found that Plaintiff's mental impairments could be reasonably expected to cause his alleged symptoms but that his "statements concerning the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record[,]" *id.* at 21, which she acknowledged reflected Plaintiff's history of depression and PTSD, including symptoms of depressed mood, difficulty sleeping, decreased interest in daily activities, and suicidal thoughts. She further acknowledged Plaintiff had suffered physical and emotional abuse, experienced "significant mood disturbances, intrusive thoughts, and possible psychotic

---

[2] Plaintiff had three types of past employment: (1) housekeeping cleaner; (2) warehouse worker; and (3) van driver helper. Delivering appliances was his most recent employment.

9

symptoms[,]" *id.* at 23, and had academic difficulties and test scores indicative of borderline range of intellectual functioning. ALJ Sutker nonetheless concluded the nature and severity of Plaintiff's mental impairments did not support a greater RFC than assessed. She pointed to his treatment notes and mental status exams which contained no evidence of cognitive dysfunction. Moreover, Plaintiff was able to follow simple instructions, repeat a phrase correctly, and recall two out of three words. Accordingly, she decided that there was "little evidence of poor judgment or disordered thought process." *Id.* Observing that Plaintiff was able to engage in substantial gainful activity in the past despite his limited education and borderline intellectual functioning, she found he was only "affected by moderate mental deficits cause[d] by his mental impairments." *Id.*

ALJ Sutker further determined that, although Plaintiff reported angry outbursts, he was cooperative and pleasant during exams and capable of social interaction with his examiners and treatment providers. He was also able to travel alone and shop in stores. The notes for intellectual and psychiatric treatment available did "not describe significant difficulties in interacting with coworkers, supervisors, or the general public." *Id.* at 24. Plaintiff had no history of inpatient hospitalization and psychiatric care and there was "a lack of objective evidence showing [Plaintiff] cannot meet the basic mental demands of uncomplicated tasks and adopt to occasional workplace changes where contact with the public is incidental." (AR 24.) Plaintiff himself reported that he "g[ot] along with people well." *Id.* at 417.

In light of Plaintiff's conservative treatment regimen of prescription medication and counseling, as well as his "wide range of activities of daily living[,]" *id.*, and that he "felt 'all right' most of the time[,]" *id.*, ALJ Sutker concluded Plaintiff's mental impairments did "not support a finding of marked or extreme limitations in mental functioning." *Id.* Plaintiff's Mini-Mental Status exams indicated an overall mild cognitive impairment, and progress notes from his physician indicated euthymic mood and appropriate insight.

Plaintiff argues that ALJ Sutker's credibility determination with respect to his ability to function independently was erroneous because she failed to take into consideration his dependence on his girlfriend as his caregiver. For medical evidence to support his claims regarding his inability to function independently, Plaintiff cites Dr. DuWors's opinion that his girlfriend "is essentially his caretaker, reading to him his mail, responding to inquiries directed to him, as conceptualization is problematic for him[,] and otherwise managing his daily affairs." (AR 491.)

"Psychiatric testing is inherently based on subjective reports[, thus] [a] medical diagnosis will often be informed by the patient's subjective description of his or her symptoms[,]" which "is all the more true in cases involving mental health, which tend to be less susceptible to objective testing and assessment." *Rucker*, 48 F.4th at 92. "Indeed, whether a medical provider is dealing with mental or physical impairments, consideration of a patient's report of complaints, or history, as an essential diagnostic tool, is a medically acceptable clinical and laboratory diagnostic technique." *Navedo v. Kijakazi*, 616 F. Supp. 3d 332, 348 (S.D.N.Y. 2022).

Although an ALJ may not "reject a medical source's opinion solely because it relies on subjective complaints, he or she may assign a treating source's opinion little weight if it is based on a claimant's questionable, subjective complaints." *Georgiana W. v. Comm'r of Soc. Sec.*, 2021 WL 2809553, at \*9 (W.D.N.Y. July 6, 2021) (internal quotation marks, citation, and emphasis omitted). Because ALJ Sutker concluded Plaintiff's subjective complaints regarding his inability to complete daily activities independently were not wholly credible, she did not err in rejecting Dr. DuWors's opinions based thereon. *See Georgiana W.*, 2021 WL 2809553, at \*9 (concluding that "[w]hen the ALJ finds the claimant's allegations not credible, he is entitled to discount the opinion of a medical source who relied on the claimant's subjective complaints[]") (internal quotation marks and citation omitted).

In summary, ALJ Sutker's opinion that Plaintiff's subjective complaints regarding the extent of his mental limitations were not entirely consistent with the record was supported by substantial evidence, although there was also evidence to the contrary. *See*

11

*Smith v. Colvin*, 17 F. Supp. 3d 260, 264-65 (W.D.N.Y. 2014) ("Even where there is substantial evidence in the record weighing against the Commissioner's findings, the determination will not be disturbed so long as substantial evidence also supports it."). "It is the Commissioner who resolves evidentiary conflicts and determines credibility issues, and the court 'should not substitute its judgment for that of the Commissioner.'" *Susan B. v. Comm'r of Soc. Sec.*, 515 F. Supp. 3d 225, 232 (D. Vt. 2021) (quoting *Yancey*, 145 F.3d at 111).

## C.   Whether Substantial Evidence Supports the ALJ's Conclusion that Dr. DuWors's Opinions on Plaintiff's Mental Limitations Were Not Persuasive.

Plaintiff argues that ALJ Sutker selectively cherry picked from the examinations, treatment notes, and opinions provided by Dr. DuWors in order to manufacture inconsistencies that do not exist when the evidence is considered as a whole. ALJ Sutker concluded that Dr. DuWors's February 2021 opinions were vague, largely based on Plaintiff's subjective statements, and found Plaintiff had significant limitations during a time period when he was gainfully employed.

"When making a determination of disability, an ALJ must consider all of the available evidence in the individual's case record, including the opinions of medical sources." *Karen S. v. Comm'r of Soc. Sec.*, 2020 WL 4670911, at *13 (D. Vt. Aug. 11, 2020) (internal quotation marks, alteration, and citation omitted). An ALJ must articulate *how* they considered medical opinions and prior administrative findings, as well as *how persuasive* they found them. 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b).

An ALJ "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider each medical opinion or prior administrative finding in the record and evaluate its persuasiveness in accordance with five factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including: (i) length of treatment relationship, (ii) frequency of examinations, (iii) purpose of treatment relationship, (iv) extent of

treatment relationship, (v) examining relationship); (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *See id.* §§ 404.1520c(c), 416.920c(c).

The factors of supportability and consistency "are the most important factors [an ALJ] consider[s]" when determining the persuasiveness of a medical opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). An ALJ must therefore articulate how he or she considered the supportability and consistency of a medical opinion and may, but need not, address the remaining three factors. *Id.* "[W]hen the record contains competing medical opinions, it is the role of the Commissioner to resolve such conflicts." *Diana C. v. Comm'r of Soc. Sec.*, 2022 WL 1912397, at *7 (S.D.N.Y. Apr. 11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)).

"[I]t is well-settled that an ALJ may discount an opinion when it is internally inconsistent." *Coleman v. Comm'r of Soc. Sec.*, 335 F. Supp. 3d 389, 398 (W.D.N.Y. 2018); *see also Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (summary order) ("A physician's opinions are given less weight when his opinions are internally inconsistent."); 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1) ("The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."). An ALJ may also conclude that inconsistencies with other evidence in the record negatively impacts the persuasiveness of a medical opinion. *See* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2) ("The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be.").

From January 27, 2021 through October 21, 2021, Dr. DuWors treated Plaintiff for his mental health and cognitive challenges. On February 3 and 23, 2021, he conducted a clinical psychological and neuropsychological examination of Plaintiff in which Plaintiff was an active participant such that his results reflected his best test-taking abilities. On

June 10, 2021, Dr. DuWors completed a medical source statement wherein he checked boxes and occasionally provided additional explanations. At the time, he had been treating Plaintiff "every few weeks[] [for the] past few months[.]" (AR 517.)

Plaintiff scored 75 on a full-scale IQ test,[3] which placed him in the borderline intellectual functioning range. Plaintiff's memory index scores on the Weschler Memory Scale IV were "relatively robust" compared to those predicted by his IQ, scoring in the average or low average range for all categories. The Conners' II Continuous Performance test suggested a 99.9% probability that Plaintiff had "significant attentional issues." *Id.* at 488. Plaintiff tested in the borderline range for language functioning. Plaintiff's visual and visual-spatial scores, which reflect an individual's potential to "integrate non-verbally presented material[,]" to view "themselves within the context of their own lives[,]" and to "appreciate the pragmatic . . . aspects of language[,]" *id.* at 489, were in the average to low average range. Plaintiff received a mix of low average, average, and high average scores in executive functioning, which is "the capacity to organize and sustain activities designed towards achieving goals." *Id.* His ability to respond to shifting task demands tested in the average range.

Based on his testing, Dr. DuWors repeatedly indicated Plaintiff has only a "minor" intellectual impairment. *Id.* at 486, 586-64. Plaintiff's personality testing supported a diagnosis of recurrent major depression without psychosis and indicated paranoid personality. Relying on Plaintiff's reported symptoms, medical history, and test results, Dr. DuWors diagnosed Plaintiff with complex PTSD, paranoid personality, "minor intellectual disability," and attention deficit disorder. *Id.* at 491. He opined that Plaintiff's post-concussive syndrome further impacted his daily functioning as well as his verbal comprehension and working memory, limiting his capacity to support himself and maintain employment. He concluded Plaintiff's "myriad of orthopedic and medical disabilities, exacerbated by chronic pain[,] further handicap any potential for being

---

[3] Plaintiff's verbal comprehension, working memory, and full-scale component scores were in the borderline range while his perceptual reasoning, processing speed, and general ability component scores were in the low average range.

self[-]supporting in any way." (AR 491.) Acknowledging that Plaintiff's girlfriend "is essentially his caretaker, reading to him his email, responding to inquiries directed to him, as conceptualization is problematic for him[,] and otherwise managing his daily affairs[,]" *id.*, Dr. DuWors recommended individual psychotherapy, trial of cognitive remediation, and receipt of social security disability benefits.

In his medical source statement, Dr. DuWors checked boxes for extreme limitations in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace. He found marked limitations in Plaintiff's interacting with others and adapting and managing himself. When asked if treatment had diminished Plaintiff's symptoms, he answered "no." *Id.* at 514. He checked boxes indicating Plaintiff had a minimal capacity to adapt to changes in his environment and is only able to understand, remember, and complete simple one-to-two-step tasks. When asked to describe Plaintiff's limited capacities, he explained "cognitive disability." *Id.* Because of Plaintiff's memory and executive functioning limitations, Dr. DuWors concluded Plaintiff would be off task for at least 20% of the workday and absent from work at least four times per month for "therapeutic interventions[.]" *Id.* at 520.

Dr. DuWors opined that Plaintiff would be unable to handle routine or superficial interactions with supervisors and coworkers due to his "very low frustration tolerance[,] high impulsiveness, [and] anger management issues[.]" *Id.* He determined Plaintiff would need one-on-one supervision at work and would be unable to interact with the general public, even over the phone, or cope with normal work stress. He checked a box indicating that Plaintiff's limitations had been present since at least December 18, 2019.[4] His treatment notes indicate he was assisting Plaintiff "in obtaining disability benefits."

---

[4] "An ALJ may properly consider a medical provider's testimony that may be incongruous with the plaintiff's alleged onset date." *Marthens v. Colvin*, 2016 WL 5369478, at *14 (N.D.N.Y. Sept. 22, 2016). Where, as here, a medical opinion concludes that a plaintiff's "significant limitations encompass a period of time during which [the] plaintiff was engaging in substantial gainful employment[,]" an ALJ may properly resolve the "conflicts in testimony or medical evidence[.]" *Id.* ALJ Sutker thus did not err in considering the inconsistency between Plaintiff's engagement in substantial gainful employment between December 2019 and March 2020 and Dr. DuWors's opinion that Plaintiff's severe limitations existed since December 2019.

(AR 493-502); *see also Tammy Lynn B. v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 184, 193 (N.D.N.Y. 2019) (holding that a treating source opinion that "appears overly sympathetic such that objective impartiality is doubtful and goal-oriented advocacy is reasonably suspected[]" can be discounted or rejected) (internal quotation marks and citation omitted).

Between the initial examinations and the medical source statement, Plaintiff was treated with cognitive behavioral therapy and was compliant with the recommended treatment regimen. No significant side effects of medications were noted, but Dr. DuWors stated Plaintiff's prognosis was "guarded." *Id.* at 517. He indicated Plaintiff's impairment had lasted or could be expected to last at least twelve months.

Dr. DuWors also tested Plaintiff's gross motor functioning, which was "[v]ery [s]uperior[,]" and his fine motor functioning, which was "[p]rofoundly [i]mpaired" in his dominant hand and "[s]everely [i]mpaired" in his non-dominant hand.[5] *Id.* at 490-91.

ALJ Sutker concluded Dr. DuWors's February 2021 opinions were unpersuasive because they were "vague, lack[ed] specificity, and require[d] restatement in vocational appropriate terms." *Id.* at 26.[6] She found Plaintiff's psychiatric examinations, wide range of independent activities of daily living, and history of conservative treatment did not support Dr. DuWors's opinions regarding Plaintiff's ability to work. ALJ Sutker further noted that Plaintiff stated he ceased working due to his hand tremors rather than his mental impairments and that Dr. DuWors did not start treating Plaintiff until late January 2021. Regarding Dr. DuWors's opinions indicating physical limitations, ALJ Sutker determined these opinions were not supported by his progress notes and were outside his expertise and scope of treatment. ALJ Sutker concluded Dr. DuWors's June 2021

---

[5] Although Dr. DuWors tested Plaintiff's motor functioning as part of his neuropsychological evaluation, the record does not indicate he treated Plaintiff for any physical medical issues.

[6] *See Schillo v. Saul*, 31 F.4th 64, 76 (2d Cir. 2022) (stating ALJ properly concluded that doctor's opinions that it might be "very difficult" for the plaintiff to perform a "physical job[]" were "too vague to be of much help in a concrete assessment of [the plaintiff's] RFC[]").

opinions were unpersuasive because they were internally inconsistent and inconsistent with Plaintiff's substantial gainful activity after December 2019.

In addition to ALJ Sutker's observations, the Commissioner directs the court to record medical evidence that conflicts with Dr. DuWors's opinions. On November 25, 2020, Gregory Korgeski, PhD, conducted a psychological evaluation of Plaintiff wherein he observed Plaintiff was cooperative and polite. He recorded Plaintiff's mood as neutral and his thinking as adequately oriented and goal-directed. Although Plaintiff reported problems with depression and episodes of intense anger, during which he wanted to harm himself or others, he conceded he was not receiving mental health counseling despite it being recommended to him by his doctor. Plaintiff acknowledged "shaking" in his hands was the "main problem[]" impacting his ability to work. *Id.* at 417.

Based on this information, Dr. Korgeski determined that Plaintiff was "likely to be of low average to borderline intellectual functioning in terms of difficulty with responding to factual information questions such as dates, and general fund of information questions, and in view of his history[,]" *id.* at 419, and diagnosed him with unspecified persistent depressive disorder, unspecified learning problems, suspected borderline intellectual functioning, and a strong possibility of PTSD.

Terry Padilla, a licensed clinical mental health counselor, conducted a consultative psychological examination of Plaintiff via video in May 2021. During this examination, Plaintiff reported struggling with hand tremors, anger, depression, psoriasis, diabetes, hearing difficulties, as well as a history of physical abuse. Based on Ms. Padilla's questioning, he described his daily activities and social interactions as well as the symptoms of his depression, which "only bother[ed] him about 30% of the time." (AR 514.) He described his memory as "[s]o-so[,]" his concentration as "[o]kay[,]" his task-to-completion as "pretty good" if he has the time, and his judgment as "[g]ood." *Id.* (internal quotation marks omitted). Although he stated he sometimes hears talking that others do not, Ms. Padilla did not deem this evidence of psychosis.

Ms. Padilla observed that Plaintiff was on time for the appointment, appeared to have no difficulty navigating the online platform, and maintained adequate eye contact

and a normal volume of goal-directed speech with logical content. Although Plaintiff appeared anxious, he did not exhibit signs of "frank psychological disturbance." *Id.* at 512.

Plaintiff scored 25 out of 30 on a Mini-Mental Status Exam conducted by Ms. Padilla which indicated a "mild" cognitive impairment. *Id.* at 19, 24, 514. He "miss[ed] the day of the week and the name of the country[,]" and "was not able to begin the serial 7s subtractions." *Id.* Plaintiff, however, spelled "world" backwards correctly, recalled two out of three words, completed a three-stage command, and wrote a sentence. He did not copy the diagram correctly. Plaintiff told Ms. Padilla that his concentration was "okay," his judgment was "good," and his ability to complete tasks was "pretty good" if he had the time, and that his medications managed his symptoms. *Id.* at 515. Ms. Padilla diagnosed Plaintiff with depression but stated it was "a less prominent issue." (AR 515.) She concluded that he appeared stable.

In December 2020, Edward Schwartzreich, MD, a non-examining agency consultant, reviewed Plaintiff's medical records and opined that Plaintiff retained the memory and comprehension for one-to-two-step instructions that did not require reading or writing. Although Plaintiff was capable of sustaining concentration, persistence, and pace for two-hour periods over the course of an eight-hour workday throughout a forty-hour workweek, he may have occasional problems with concentration, persistence, and pace due to his depression or environmental stressors. Dr. Schwartzreich assessed that Plaintiff had the social capacity for routine interactions with supervisors and coworkers but may have difficulty with intense social interactions. He opined that Plaintiff could adapt to routine changes but would have problems with rapid, unexpected, or major changes. Edward Hurley, PhD, another non-examining agency consultant, reviewed record evidence in May 2021 and assessed the same limitations as Dr. Schwartzreich.

ALJ Sutker concluded Drs. Schwartzreich's and Hurley's opinions were persuasive because they "were provided by a psychologist with program knowledge, who reviewed the available medical evidence at the time they made their assessment[,]" *id.* at 26, and included "extensive rationales to support their findings and assessed specific

functional limitations and abilities consistent with the findings on psychiatric and mental status examinations." *Id.* Their proposed restrictions on Plaintiff's social interactions were consistent with Plaintiff's symptoms and responses to his conservative treatment regimen and reflected Plaintiff's ability to complete uncomplicated tasks in a "relatively static" environment. *Id.* ALJ Sutker stated, however, that she recast Dr. Schwartzreich's proposed restrictions into "vocationally more relevant terms." *Id.*

Because Dr. DuWors's opinions were largely based on Plaintiff's subjective statements and review of medical records predating Plaintiff's alleged onset date and some of Dr. DuWors's opinions conflicted with the objective medical evidence he collected, ALJ Sutker's conclusion that his opinions were unpersuasive was supported by substantial evidence. *See Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 578 (S.D.N.Y. 2022) ("With respect to the supportability factor, the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase.") (internal quotation marks and citation omitted); *see also Sanborn v. Berryhill*, 2017 WL 923248, at *13 (D. Vt. Mar. 8, 2017) (concluding the ALJ did not err when considering that the medical source's opinion "was almost solely for advocacy-related purposes[]"); 20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3) (instructing the ALJ to consider a medical source's "relationship with the claimant" such as the "[p]urpose of the treatment relationship[]").

In addition, Dr. DuWors's opinions that Plaintiff had extreme limitations in concentrating, persisting, or maintaining pace and that Plaintiff would be unable to handle routine and superficial interactions with coworkers or incidental interactions with the general public conflict with the opinions of other medical professionals and Plaintiff's own testimony that he got along with people well as well as his work history. Although Plaintiff cites evidence that supports Dr. DuWors's opinions, the mere existence of evidence contrary to the ALJ's conclusion is insufficient to constitute reversable error. *See Smith*, 17 F. Supp. 3d at 264-65 ("Even where there is substantial evidence in the record weighing against the Commissioner's findings, the determination will not be disturbed so long as substantial evidence also supports it.").

### D. Whether Substantial Evidence Supports ALJ Sutker's Conclusion that Dr. DuWors's Opinions Regarding the Extent of Plaintiff's Physical Impairments Were Not Consistent.

Plaintiff challenges ALJ Sutker's conclusions that Dr. DuWors's opinions regarding Plaintiff's physical limitations were not supported by his progress notes and were outside his area of expertise and scope of treatment. The Commissioner argues the scope of Dr. DuWors's expertise is more limited than Plaintiff contends and that objective medical evidence supports ALJ Sutker's conclusion that Plaintiff's physical limitations were not as severe as Dr. DuWors suggested.

An ALJ may consider the fact that an opinion is outside the scope of a medical source's expertise when assessing the persuasiveness of that opinion. *See Hochmuth v. Berryhill*, 2019 WL 2516050, at *8 (W.D.N.Y. June 18, 2019) (concluding it was appropriate for the ALJ to consider that an "opinion regarding [the] [p]laintiff's physical limitations [was] outside the scope of [the plaintiff's psychologist's] expertise[]"); *see also* 20 C.F.R. §§ 404.1520c(c)(4), 416.920c(c)(4) ("The medical opinion . . . of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion . . . of a medical source who is not a specialist in the relevant area of specialty."). An ALJ is required to consider the extent to which an opinion is supported by "objective medical evidence and supporting explanations[.]" 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1).

Although the parties dispute whether testing Plaintiff's intention tremors in his hands was within the scope of Dr. DuWors's expertise, the record is not fully developed on this issue. ALJ Sutker correctly pointed out that Dr. DuWors's notes do not indicate that he was treating Plaintiff's tremor. *See Medick v. Colvin*, 2017 WL 886944, at *6 (N.D.N.Y. Mar. 6, 2017) ("An ALJ may accord less weight to a treating physician where he comments on conditions for which he did not treat."). Nor was Dr. DuWors's opinion on Plaintiff's physical limitations the only medical evidence in the record.

In October 2019, Plaintiff reported intermittent tingling and numbness in both hands, stating these symptoms were more pronounced when his hands were flexed and he was typing on his cellphone. Considering these symptoms appeared to be related to carpal tunnel syndrome, which was more prominent in Plaintiff's right hand, Narandra K. Bethina, MD, advised Plaintiff to wear wrist braces at night to alleviate his symptoms.

Approximately one year later, Plaintiff saw Richard Morrison, MD, who conducted a physical examination wherein he observed that Plaintiff did not exhibit any unusual pain responses and that he appeared able to perform "gross and dexterous movements." (AR 413.) Dr. Morrison concluded Plaintiff's physical examination was normal and recorded that Plaintiff had 5/5 grip strength, intact reflexes, and normal sensations in his hands, with no evidence of tremor or rigidity, although Plaintiff exhibited a 2+ shake in his hands when his arms were extended and outstretched, the shaking in Plaintiff's hands did not appear to affect his dexterity. ALJ Sutker determined Dr. Morrison's opinions were generally consistent with clinical findings from the date of the examination but that he did not "adequately consider the cumulative impact" of Plaintiff's "intention tremors and obesity." *Id.* at 25. On that basis, ALJ Sutker concluded Dr. Morrison's opinions were unpersuasive.

Plaintiff sought further assessment of his tremors from Kylie A. Abe, MD, a neurologist, on December 15, 2020, who concluded:

> At this time[,] [Plaintiff's] tremor is relatively mild and is not functionally limiting, so [Plaintiff] opted to forgo initiating any treatment. Mostly he wanted reassurance that he did not have any early signs of Parkinson's Disease, which we assured him he did not at this time.

*Id.* at 432-33. Plaintiff's reports of tingling and numbness were likely unrelated to the tremor, and his symptoms suggested a compressive etiology in his median and ulnar nerves bilaterally.

In December 2020, Geoff Knisely, MD, reviewed Plaintiff's medical records and opined that Plaintiff was limited in fingering in both hands and his fingering should be restricted to "frequent." *Id.* at 79. Dr. Knisely also determined Plaintiff had limitations with hearing and should avoid moderate exposure to noise and hazards. ALJ Sutker

concluded Dr. Knisely's opinions were generally persuasive because they were well-supported and consistent with the record, including evidence of Plaintiff's symptoms of shakiness in his hands.

Between October 2020 and July 2021, Plaintiff's primary care physician, Wyll Everett, MD, evaluated him three times for the shaking in his hands, among other issues. In October 2020, Plaintiff reported having had tremors in his hands for years and dropping things, like his cellphone, more frequently as of late. He had not experienced a change in his daily functioning or activities despite allegedly longstanding slight weakness in his hands and denied tingling or numbness. Dr. Everett observed an "extremely slight bilateral hand tremor at rest," which "increases to a mild severity when holding hands in front of him or while holding his [cell]phone." *Id.* at 440. Plaintiff had full motor strength and intact sensation of his upper extremities and his symptoms were consistent with an intention tremor. Two months later, Dr. Everett evaluated Plaintiff again and reached the same conclusion.

Thereafter, Dr. Everett observed a slight intention tremor in July 2021, although there were no deficits in Plaintiff's coordination, strength, or sensation in his upper and lower extremities. He opined that Plaintiff could lift and carry up to fifty pounds frequently and could stand or walk for less than two hours per workday. Plaintiff could frequently handle and constantly finger and feel objects but would be off task at least 20% of the workday and absent at least four days per month due to his "significant psychiatric disease[.]" *Id.* at 524. ALJ Sutker concluded that Dr. Everett's opinions were not persuasive because they were inconsistent with his treatment notes.

ALJ Sutker relied on the foregoing evidence to support her conclusions regarding Plaintiff's physical limitations and incorporated the opinions that she found persuasive into Plaintiff's RFC. She cited Dr. Everett's October 2020 physical exam that showed only a slight bilateral hand tremor at rest and a mild severity when Plaintiff held his hands in front of him or held his cellphone. During the same exam, Plaintiff exhibited 5/5 strength and intact sensation of his upper extremities. Plaintiff tested negative for Tinel's and Phalen's signs in both hands as well. Although Plaintiff's fine motor functioning in

his hands tested in the profoundly and severely impaired range during Dr. DuWors's examination, ALJ Sutker noted that Plaintiff's gross motor functioning tested in the very superior and superior range. Dr. Everett's July 2021 exam also showed "no visible deficits in cranial nerve function, coordination, strength, or sensation in the upper extremities." (AR 22.) She further noted the absence of evidence of abnormal reflexes in his upper extremities and the absence of treatment records for his tremors. Citing his daily activities which included household chores, laundry, playing games on his phone, and fishing, the ALJ found no support for a significant limitation in the use of Plaintiff's hands.

Because evidence supporting Dr. DuWors's opinions on Plaintiff's tremor is limited to a single evaluation of his motor functions and the record contains ample evidence that contradicts Dr. DuWors's opinions on Plaintiff's physical limitations, ALJ Sutker did not err when she concluded Dr. DuWors's opinions on the extent of Plaintiff's physical limitations due to his intention tremors were not persuasive.

## CONCLUSION

For the reasons stated above, the court DENIES Plaintiff's motion for an order reversing the decision of the Commissioner (Doc. 8) and GRANTS the Commissioner's motion to affirm (Doc. 12).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 23rd day of April, 2024.

Christina Reiss, District Judge
United States District Court

23